O.B. UTLEY, Jr., et al., Appellants,

v.

MARATHON OIL COMPANY and
Delhi Gas Pipeline Corporation,
Appellees.

No. 10–97–307–CV.

Court of Appeals of Texas,
Waco.

June 28, 2000.

Rehearing Overruled Nov. 22, 2000.

Roy William Hill, Fairfield, Clinard J. Hanby, The Woodlands, for appellants.

Greg White, McGregor & White, Waco, Jon David Ivey, Baker & Hostetler, L.L.P., Houston, for appellees.

Before Chief Justice DAVIS, Justice VANCE and Justice GRAY.

## OPINION

TOM GRAY, Justice.

This is an oil and gas case. It arises from a lease that was executed by Utley, et al., on February 12, 1974. Utley brought suit to clear title to their property of Marathon's oil and gas lease. Utley contended that the lease had expired due to the failure of Marathon to continue operations on the lease and failed to pay shut-in royalties in the proper amounts at the proper time. After 8 days of testimony and presentation of other evidence the jury answered questions which support a judgment that the lease had not expired. The trial court entered a judgment based upon the jury's answers. We are asked to review the jury's answers and the relevant law to determine if the jury's answers and the judgment are proper. We affirm.

## THE UTLEY B–1 WELL

The oil and gas lease had a primary term of five years. It was scheduled to expire by its own terms as of February 12, 1979. Under the terms of the lease it would not expire at the end of the primary term as long as Marathon was then engaged in exploration on the property for oil and gas. The specific provision in the lease stated if Marathon was "... engaged in operations for drilling, mining or reworking any well or mine thereon, this lease shall remain in force so long as such operations or said additional operations are commenced and prosecuted (whether on the same or successive wells) with no cessation of more than ninety (90) consecutive days...." This is known as a "continuous operations clause."

In late 1978, Marathon decided that it wanted to hold lease acreage that would otherwise expire by operations rather than by having to obtain new leases. Leasing costs had increased because of recent successful exploration in the area. There is nothing sinister about a decision to hold acreage by operations as a business alternative. It is an economic decision that the oil company must make based upon all the circumstances; whether to simply allow the lease to expire, negotiate a new lease or incur the cost and uncertainties of immediately pursuing exploration.

On December 14, 1978, drilling began on the Utley B–1 well. It was drilled to its target depth on March 22, 1979. Marathon engaged in various tests of the well over the next several weeks. It is undis-

puted that the operations until early April, specifically April 16, 1979, continued the lease in effect.

On September 24, 1979, Marathon began the necessary steps to complete the Utley B–1 well in the Bossier Sand formation from which production was achieved in paying quantities. It is also undisputed that the operations which commenced on September 24, 1979, and subsequent production would have kept the lease from expiring at that time.

## UTLEY'S CONTENTION REGARDING THE B–1

Utley's theory at trial was that the operations between April 16, 1979 and September 24, 1979 were not in good faith or did not qualify as "continuous operations." This would be a period of more than ninety consecutive days in which there were not good faith operations to cause the well to produce. If this occurred the lease expired by its express terms. The first question in the charge to the jury was whether operations on the B–1 ceased for any period of longer than ninety consecutive days between February 12, 1979 and September 24, 1979. They answered "NO." In issue two on appeal Utley contends the jury's answer is not supported by legally or factually sufficient evidence.

## THE EVIDENCE

There were two types of activities which occurred during this critical period of time. First, there were activities testing and trying to obtain production from the Cotton Valley Lime formation, which is a deeper geological formation than the Bossier Sand. The Cotton Valley Lime is a geological formation which had proven to be productive in the general area of the B–1. However, the B–1 was outside the proven area of the productive Cotton Valley Lime formation and was thus classified as a "wildcat" well. At the time that the permit to drill the well was obtained, it was designated for a target depth in the Cotton Valley Lime. The other activity on the lease during this period of time was the construction of a pipeline to connect the

well so that the gas produced could be sold to a gas marketing company.

## TESTING THE COTTON VALLEY LIME

Both parties had expert witnesses testify regarding the merits of testing the Cotton Valley Lime formation for potential production. The experts explained the method by which oil and gas is trapped in pockets and how a particular well site is chosen. The experts explained to the jury the physical process of drilling, testing and completing a well. The experts also explained the various indications which may be present when drilling a well that would indicate the presence of oil or gas. They discussed standard industry practices as well as the specific process of drilling the B–1.

One of Utley's experts testified that operations after April 14, 1979 were "nonprudent." He also testified that he would not have recommended attempting to complete a well in the Cotton Valley Lime formation.

On cross examination, this expert admitted that based upon the drilling records, various events had occurred that indicated the possible presence of a zone in the Cotton Valley Lime capable of gas production. Specifically he acknowledged that various indicators (drilling break, gas show, oolitic limestone, lost circulation and fractured porosity) were all present while drilling the B–1. He also testified that if he was drilling a well and was presented with these indicators he would be "excited." He also acknowledged that before you know for certain that a well will not produce in paying quantities, you must test it by perforating the casing. Ultimately, he also admitted that he had previously given sworn deposition testimony that the operations from April 14, 1979 to April 21, 1979 were not imprudent.

Another expert called by Utley testified that by March 17, 1979, the B–1 could have been, and should have been determined to be non-productive by anyone with the facts

then available. He testified positively and firmly that based upon his examination of the data it was his opinion that it was obviously not going to be productive from the Cotton Valley Lime and thus the operations to complete the well in the Cotton Valley Lime did not keep the lease from terminating. Thus, it was his opinion that the lease terminated at that time as to all acreage not held by some other specific provision of the lease.

On cross examination, he explained he assumed during that time Marathon was trying to get a sustained gas flow from the Cotton Valley Lime but "... they're not doing very good at it, but that's what they're trying." He also acknowledged there was some gas flow established after a hydraulic "fracing" operation. But, this flow was accompanied with a large volume of salt water which would have a disposal cost.

Marathon offered the testimony of their own experts as well as employees of the company. One of the experts explained why Marathon first completed the well in the Cotton Valley Lime. He testified April 21 or 22, 1979, was the last day of testing before the hydraulic fracture was performed in September. Marathon's decision to try to make the Cotton Valley Lime productive was based partially upon the fact that the well was producing 185,000 cubic feet of gas per day during the April testing and that with a hydraulic fracture operation completed they expected 1 million to 1.5 million cubic feet of gas per day. It was his testimony that this formation was not a dry hole.

Marathon's expert explained that when initially testing the well, the tubing must be perforated in the lowest formation first to actually determine the productivity of that formation. If the lower formations are not productive, the perforations must be made further up the bore hole to other zones until a well could be completed in a satisfactory zone.

It is undisputed that the process to fracture the Cotton Valley Lime formation began on August 18, 1979. The results of the hydraulic fracture operation were not as successful as Marathon had hoped but it was promising enough that they did not want to permanently abandon this formation. Marathon concluded they would set a temporary plug between the Cotton Valley Lime and the Bossier Sand to allow further testing and production from higher up in the well. The efforts to set the temporary plug failed. The well was then permanently plugged back to the Bossier Sand from which production was obtained.

Another of Marathon's experts, a lawyer/petroleum engineer, testified that the Cotton Valley Lime was the potential for a whole new zone of production for Utley and that Marathon had spent $440,000 trying to make that zone productive. His testimony was that the Cotton Valley Lime was not an unproductive zone, but that Marathon recognized that after fully testing the Cotton Valley Lime they "just had a better economic opportunity" by completing a well in the Bossier Sand formation.

A third expert for Marathon, testified that he had reviewed a tremendous volume of information regarding the B–1. He testified firmly and positively that it was his opinion that the operations on the B–1 "were reasonable and prudent." He also testified that there was no break in operations on the B–1 for more than 90 days.

## PIPELINE CONSTRUCTION

The testimony is generally undisputed that during the time from April 16, 1979 until September 24, 1979 a pipeline was being constructed on the property. We accept as undisputed that the sole purpose of the pipeline was to connect this particular well to the gas gathering system to transport the gas to market for ultimate sale. Utley contends pipeline construction is not "operations" that will extend the lease.

Utley did not object to the charge for failure to include an instruction that would prevent the jury from considering pipeline

construction as operations. Utley did not request such an instruction. Without this guidance on the law, the jury may have considered the pipeline construction as operations as argued by Marathon, or disregarded it as argued by Utley. Because the issue was submitted broad-form, we have no way of determining what activity the jury considered as "operations."

To obtain a reversal, Utley must show there is legally or factually insufficient evidence to support the jury's verdict. In other words, even if Utley is right that pipeline construction is not "operations" as used in the lease, Utley must still show that there is insufficient evidence of other "operations" to support the jury's answer. Thus, if there is legally and factually sufficient evidence to support the jury's determination that the lease did not expire for lack of "operations" without regard to the pipeline construction, we need not consider whether pipeline construction constitutes "operations" as that term is used in the lease.

## STANDARD OF REVIEW

■ When we decide a legal insufficiency issue, we consider only the evidence and inferences which tend to support the contested issue and disregard all evidence and inferences to the contrary. *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997), *cert. denied*, 523 U.S. 1119, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998). We will sustain a no evidence point if: (a) there is a complete absence of evidence of a vital fact; (b) we are barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *Id.* (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960)). "More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex.1995) (quoting *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex.1994)).

■ A factual sufficiency challenge requires us to consider and weigh all the evidence, not just the evidence which supports the verdict. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986) (per curiam); *In re King's Estate*, 150 Tex. 662, 664–65, 244 S.W.2d 660, 661 (1951). We will "set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain*, 709 S.W.2d at 176; *Blankenship v. Mirick*, 984 S.W.2d 771, 774 (Tex.App.—Waco 1999, writ denied).

## APPLICABLE LAW—GOOD FAITH OPERATIONS

The trial court instructed the jury "... that **operations** means actual work being done in a good faith endeavor to cause a well to produce oil and/or gas in paying quantities." There was no objection or attempt to limit what evidence the jury could consider.

There is not much Texas authority defining "operations" in the context of those operations that will keep an oil and gas lease alive by continuous operations. There are a few decisions which discuss "reworking operations" that are worth mentioning. In *Phillips*, the Texarkana Court implicitly, if not explicitly, approved an instruction defining "reworking operations" as:

> You are instructed that after the Rudd–Hall well was completed and failed to produce on its original test, any and all efforts, acts, work or operations thereafter done in or on said well in a good faith effort to cause said well to produce oil or gas in paying qualtties (sic) are to be considered by you as reworking operations as that term is used in Special Issue No. 1.

*Phillips Petroleum Co. v. Rudd,* 226 S.W.2d 464, 466 (Tex.Civ.App.—Texarkana 1949, no writ).

In *Rogers,* the Court noted a somewhat similar instruction which read as follows:

> You are instructed that the term "reworking operations," as used herein, means actual work or operations which have theretofore been done, being done over, and being done in good faith endeavor to cause a well to produce oil and gas or oil or gas in paying quantities as an *ordinarily competent operator* would do in the same or similar circumstances.

*Rogers v. Osborn,* 152 Tex. 540, 261 S.W.2d 311, 313–314 (1953). However, the Court backed away from validating the instruction by stating: "We hold there is some evidence supporting this finding [of 'reworking' or 'drilling'] but do not pass upon the trial court's definition of the words *drilling* and *reworking.*" *Id.* at 314.

In *Cox,* the Amarillo Court concluded that the term "reworking operations," meant " . . . any and all actual acts, work or operations in which an ordinarily competent operator, under the same or similar circumstances, would engage in a good faith effort to cause a well or wells to produce oil or gas in paying quantities." *Cox v. Stowers,* 786 S.W.2d 102, 105 (Tex. App.—Amarillo 1990, no writ). *See also Hydrocarbon Management, Inc. v. Tracker Exploration, Inc.,* 861 S.W.2d 427, 438 (Tex.App.—Amarillo 1993, no writ).

In the absence of an objection to the instruction we must consider the evidence in light of the definition of operations given by the trial court. The instruction defined the conduct which the jury could consider in determining if operations on the leased property had ceased for a period of more than 90 consecutive days.

## APPLICATION REGARDING THE UTLEY B–1

■ This is a classic case of competing experts. Neither party produced a "smoking gun." Thus it was left to the jury to resolve disputed issues of fact by weighing the credibility of the witnesses and determining the weight to give the evidence. Even if the evidence regarding the pipeline is not considered, both parties had a substantial amount of evidence in support of their positions. There were many pages of exhibits introduced for the jury's consideration. The jury resolved the factual issue against Utley, in favor of Marathon and determined that operations had not ceased on the Utley B–1 well for more than 90 consecutive days between April 16, 1979 and September 24, 1979. We see no reason to disturb this finding. Utley's second issue is overruled. We do not reach the issue of whether the pipe-line construction constituted operations.

## SHUT–IN ROYALTIES

■ In issue one on appeal, Utley asks the question: "Did the portions of the mineral lease included in Units No. 1, A, and C terminate in 1983 for failure to pay shut-in royalties in the proper amount or at the proper time?" Under this single issue Utley raises four sub-issues. Essentially Utley complains that the jury's determination that the three wells were not shut-in for more than 90 consecutive days in 1983 is not supported by any evidence, that the contrary was established as a matter of law, and that the jury's answer should be disregarded. Next Utley argues that the construction of the lease is a question of law as to the required amount of shut-in royalties. It is under this sub-issue Utley presents the question of whether a delay rental clause expressed in absolute dollars ($1,842.92) rather than dollars-per-acre, if referenced as the amount of shut-in royalty, requires the payment of the absolute dollar amount for each portion of the leased acreage that is included in a pooled unit or whether the shut-in royalty can be reduced for the number of lease acres that are included in the pooled unit. In essence, under the terms of this lease, was the shut-in royalty on pooled units subject to proportionate reduction? Utley contends, under the

terms of this lease, there is no proportionate reduction provision for shut-in royalties on pooled units and thus the $1,842.92 dollars must be paid for *each* pooled unit shut-in, regardless of how many pooled units contain some portion of the Utley lease acreage. Next, Utley contends that the evidence is legally and factually insufficient to prove that the shut-in royalty payments made were in the proper amount or at the proper time.

The sub-issues presented are complicated, and consumed much of the time at trial. However, we find that an answer to these questions is not necessary to a full disposition of this appeal. As discussed above the jury determined that the B–1 well did not suffer a 90 day cessation of operations in 1979. The jury determined in special question five that the acreage held by B–1 was not subject to what is commonly called a Freestone Rider or Pugh Clause. A Freestone Rider generally provides that a well on pooled acreage holds only those acres in the lease that are actually included in the pooled unit designation. On the other hand, a lease-hold well, as its name implies, generally holds all the leased acreage, even if the acreage is not in the production unit for the lease-hold well. The B–1 was a lease-hold well. It was not included in any pooled unit. Thus the B–1 held all lease acreage. In this situation, we must look past the question posed by Utley to answer the question: What would be the result of failing to pay shut-in royalties for the pooled acreage?

This question has been answered by the Commission of Appeals in 1930. *Duff v. Du Bose,* 27 S.W.2d 122, 124 (Tex. Comm'n App.1930, judgm't affirmed). The Court held that acreage not held by pooling reverted to or was controlled by the other provisions of the lease. Thus, if for some reason the pooled acreage was no longer held under the pooling provision of the lease, it is still part of the acreage leased, and thus, one must determine what is the status of the underlying lease to determine

if the lease has terminated as to the pooled acreage. In *Duff,* as in the present case, the lease had a continuous operations clause. At the time the pooling agreement ended, the lessee did not commence operations and the Court held that the lease expired by its terms. As the Court explained:

> When the lease was reconveyed to the defendant [after the pooling agreement was canceled] there was no production of any character from the land, and there has been no production nor effort to obtain production since it was reconveyed to the defendant, and neither have any rentals been paid or tendered. Such being the case the lease has forfeited and terminated by its own terms.

*Id.* As applied to the present case, if the shut-in royalties were not paid on the acreage being held by a well on pooled acreage, whether or not the acreage was still subject to the lease would then be dependant upon other provisions of the lease.

As discussed above, the jury determined that the B–1 held all acreage, not just the acreage in the production unit. The jury's finding in this regard is not attacked on appeal. Thus, even if Marathon failed to pay shut-in rentals in the amounts and at the times due, as long as the lease was held by production or operations on the B–1, or by other means, the lease, even as to the pooled acreage, did not expire.

However, the jury also determined that the B–1 well was shut in for a period longer than 90 consecutive days between June 1 and November 8, 1983. Although the jury determined that the proper amount of shut-in royalties had been paid on the B–1, this does not end the analysis. The lease clearly provided that the acreage being held solely by the payment of shut-in royalties for the B–1 (all non-pooled acreage) could be proportionately reduced to exclude the acreage being held in the pooled units. Thus, if Marathon was relying on only the payment of shut-in royalties for the B–1 to hold all the acreage in the lease, Marathon could not utilize the

proportionate reduction provision for un-pooled acreage to reduce its payments. However, a payment of shut-in royalty is not the only provision that would hold all the acreage under the lease.

Continuous operations could also hold all the lease acreage. In this case, during the time the B–1 was shut-in, it is undisputed that another lease-hold well was commenced and completed. The spud date (the date drilling began) on the Utley H–1 well was July 18, 1983. It was drilled to completion, completed and then shut-in on October 4, 1983. It remained a lease-hold well until November 7, 1983 when a pooling designation was filed. Thus, there was a maximum of only 48 days after shut-in on the B–1 before drilling on the H–1 began (June 1 to July 18), and only 36 days after the H–1 well was completed and shut-in (October 4 to November 8) during which there was no production and no operations. Based upon the operations on the H–1, there was no period between June 1, 1983 and November 8, 1983 during which operations on the Utley lease ceased for a period longer than 90 consecutive days.

Under these facts, payment or non-payment of shut-in royalties is immaterial. All lease acreage not held under the pooling provision, was still subject to the other provisions of the lease. The other provisions of the lease provided that the lease would not terminate as long as there was production or operations without cessation for more than 90 consecutive days. Utley has not proven a cessation of production or operations on the lease for more than 90 consecutive days and the uncontroverted evidence in the record is that there was no cessation of operations for more than 90 consecutive days during the period at issue in 1983. Thus we need not address the amount or timing of payments of shut-in royalties.

Issue one is overruled.

## CROSS APPEAL–REDUCTION OF ATTORNEY FEES

By cross-appeal, Marathon complains that the trial court abused its discretion in reducing the jury award for attorney fees. Utley had sued on numerous theories. Marathon had asserted numerous defensive theories. The claim for declaratory judgment was the only theory which would support an award of attorney fees. The jury returned a verdict for attorney fees in favor of Marathon in the amount of $750,000. The trial court entered a judgment for this amount. In response to a post trial motion, the trial court reduced the award to $150,000. The attorney fees incurred in this case are substantial. There was ample documentary evidence and testimony regarding the causes of action plead, discovery undertaken, other pretrial procedures and trial time necessary to obtain the judgment in Marathon's favor.

Under the declaratory judgments act, the granting of attorney's fees is with the discretion of the trial court. *See* TEX. PRAC. & CIV. REM.CODE ANN. § 37.009 (Vernon 1997); *Bocquet v. Herring,* 972 S.W.2d 19, 20 (Tex.1998). The act, however, imposes four limitations on that discretion. *See Bocquet,* 972 S.W.2d at 21. The attorney's fees must be (1) reasonable, (2) necessary, (3) equitable, and (4) just. *See id.* Whether the attorney's fees are reasonable and necessary are fact questions. *See id.* Whether the attorney's fees are equitable and just are matters of law, which come within the trial court's discretion. *See id.* The court may conclude it is not equitable or just to award reasonable and necessary attorney's fees. *See id. Stephenson v. LeBoeuf,* 16 S.W.3d 829, 843 (Tex.App.—Houston [14th Dist.] 2000).

We do not find that the trial court abused its discretion in rendering a judgment for the award of attorney fees in the amount of $150,000. Marathon's issue on its cross-appeal is overruled.

## CONCLUSION

Based upon our holding, we need not reach Utley's third issue regarding laches. The trial court's judgment is affirmed.