

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-09-00026-CV

_____

EDITH ELIZABETH RAMSEY, BUCK BRYAN RAMSEY
AND OPTIMAL UTILITIES, INC., Appellants

V.

JOE GRIZZLE, CHARLES CALHOUN,
AND DONNA KAY CALHOUN, Appellees

On Appeal from the 102nd Judicial District Court
Red River County, Texas
Trial Court Nos. CV00756 & CV-01432

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter

OPINION

Very often determining which party has the burden of proof is perfunctory and does not have a great effect.  In this case, we believe the burden of proof is crucial.

Buck Bryan Ramsey and his wife, Edith Elizabeth Ramsey,[1] became the owners of real property in Lamar County upon which an oil well was located, the well having been drilled pursuant to a pre-existing oil and gas lease (the Hancock lease).  Joe Grizzle became the holder of the leasehold estate.  The operators of the well experienced problems with it, and its production was intermittent for several years.  Thinking that he had been excluded from operating the well, Grizzle filed suit to enjoin Ramsey from excluding him and to declare his lease valid; Ramsey countered with an allegation that the lease had terminated by its own terms because for more than ninety consecutive days Grizzle had no production or other operations at the well site.  Thinking the lease had expired, Ramsey entered into another oil and gas lease on the same property with Optimal Utilities, Inc., who intervened in the suit and likewise alleged Grizzle's lease had terminated for lack of operations.  Grizzle sold a ten percent interest in the lease to Charles and Donna Kay Calhoun.  Optimal brought in the Calhouns as defendants.

All parties filed what were designated as declaratory judgment actions.  The purchaser of the oil, Eastex Oil, filed an interpleader action; not knowing who to pay, Eastex deposited the money into the registry of the court.  The two cases were consolidated for trial.

---

[1]We will refer to Mr. and Mrs. Ramsey simply as Ramsey.

2

Trial was to a jury who found that Ramsey and Optimal had not shown a cessation of operations for more than ninety consecutive days. Based on that verdict, the trial court entered a declaratory judgment that the Grizzle lease was valid and awarded Grizzle attorney's fees of over $49,000.00 plus additional amounts on appeal. Ramsey and Optimal's appeals raise several issues: (1) lack of standing by Grizzle; (2) default in proof of title; (3) insufficiency of evidence to uphold the jury verdict; (4) improper attorney's fees; and (5) incurable jury argument. We affirm the judgment of the trial court in some respects, but reverse the attorney's fee award.

## I.      FACTUAL AND PROCEDURAL HISTORY

### A.      History of Leases

Pauline Hancock, G. T. Hancock, Ollie Gill, and W. E. Gill first leased the Hancock well in 1975 to Oil Development Company of Texas. A series of assignments throughout the years led to a 1999 lease to Dale Glass, who would later assign his interest to Grizzle.

When the Ramseys purchased the real estate in 2002, the ownership they acquired was subject to the existing Hancock lease.

**B.      Acquisition of Lessees' Rights by Grizzle; Assignment(s) by Grizzle**

Grizzle claims, and it appears to be generally accepted, that he got the interest in the Hancock lease by assignment from Glass in June 2003, to be effective July 1, 2003.   Glass was the lessee from the 1999 lease and the man working for Grizzle as "pumper."   Grizzle later fired Glass in January 2005 and hired Michael Brooks as pumper somewhere around February 2005.

Glass explained the confusing set of circumstances leading up to the assignment to Grizzle. He had an interest in the well and was involved in some litigation with Jack Atkins.   Grizzle got part of the interest from Atkins, but required that Glass release Atkins.   Glass would sell his claims against Atkins, then Grizzle was to furnish the money to keep the well pumping and would serve as the operator.   A man named Sparkman was the operator when Grizzle first got his interest.   Then Grizzle became operator and, according to Glass, that was "when it went to hell."

**II.      DISCUSSION**

**A.      Standing:   Trespass to Try Title or Declaratory Judgment Action**

**1.      Title was at issue in this case**

Ramsey and Optimal argue that Grizzle lacks standing to assert this claim because this case was in reality a trespass to try title case and Grizzle failed to prove a title interest in the Hancock lease.   So we must first decide whether we must review this case as a declaratory judgment or based on requirements of a trespass to try title case.

4

The Texas Supreme Court has explained that oil and gas leases are unique: In Texas it has long been recognized that an oil and gas lease is not a "lease" in the traditional sense of a lease of the surface of real property. In a typical oil or gas lease, the lessor is a grantor and grants a fee simple determinable interest to the lessee, who is actually a grantee. Consequently, the lessee/grantee acquires ownership of all the minerals in place that the lessor/grantor owned and purported to lease, subject to the possibility of reverter in the lessor/grantor. The lessee's/grantee's interest is "determinable" because it may terminate and revert entirely to the lessor/grantor upon the occurrence of events that the lease specifies will cause termination of the estate. In the cases before us today, the lessors retained only a royalty interest. When an oil and gas lease reserves only a royalty interest, the lessee acquires title to all of the oil and gas in place, and the lessor owns only a possibility of reverter and has the right to receive royalties. A royalty interest, as distinguished from a mineral interest, is a nonpossessory interest.[2] *Natural Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 192 (Tex. 2003).[3]

This recitation of Texas law by the Texas Supreme Court illustrates that title to the mineral estate is at issue here. Grizzle takes the position that he still holds the fee simple determinable, that cessation of operations did not exceed ninety days and, therefore, did not terminate the lease.

---

[2]A nonpossessory interest such as royalty interest is not a proper matter for resolution by trespass to try title. *See Grasty v. Woods*, 230 S.W.2d 568, 571 (Tex. Civ. App.—Galveston 1950, writ ref'd n.r.e.).

[3]Citing *Cherokee Water Co. v. Forderhause*, 641 S.W.2d 522, 525 (Tex. 1982); *W. T. Waggoner Estate v. Sigler Oil Co.*, 118 Tex. 509, 19 S.W.2d 27, 28–29 (Tex. 1929); Walker, *Fee Simple Ownership of Oil & Gas in Texas*, 6 TEX. L. REV. 125, 128–29 (1928); *Concord Oil Co. v. Pennzoil Exploration & Prod. Co.*, 966 S.W.2d 451, 459 (Tex. 1998); Walker, *The Nature of the Property Interests Created by an Oil & Gas Lease in Texas*, 7 TEX. L. REV. 539, 547–48 (1929).

The Ramseys and Optimal maintain that the possibility of reverter automatically vested in the Ramseys' title to the mineral estate, after which they entered into a lease with Optimal.

### 2. The impact of title as issue

With an exception not applicable here, a trespass to try title claim is the exclusive method in Texas for adjudicating disputed claims of title to real property. *See* TEX. PROP. CODE ANN. § 22.001(a) (Vernon 2000); *Martin v. Amerman*, 133 S.W.3d 262, 267 (Tex. 2004);[4] *Koch v. Gen. Land Office*, 273 S.W.3d 451, 455 (Tex. App.—Austin 2008, pet. filed); *Glover v. Union Pac. R.R. Co.*, 187 S.W.3d 201, 211 (Tex. App.—Texarkana 2006, pet. denied). When the suit does not involve the construction or validity of deeds or other documents of title, the suit is not one for declaratory judgment. *McRae Exploration & Prod. Co. v. Reserve Petro. Co.*, 962 S.W.2d 676, 685 (Tex. App.—Waco 1998, pet. denied).

In a cessation of operations case, the San Antonio court pointed out that construction of the lease was not at issue in a case. *See BP Am. Prod. Co. v. Marshall*, 288 S.W.3d 430, 453 (Tex. App.—San Antonio 2008, pet. filed). Instead, the issues were whether the defendant failed to engage in good faith drilling or reworking operations without a sixty-day cessation and committed fraud with regard to its activities. *Id.* Despite their pleading, the underlying nature of the

---

[4]After *Martin* was decided, the Legislature added to Section 37.004 a specific provision that allows for declaratory judgment action to determine a case in which the sole issue is a boundary dispute. *Martin*, then, a boundary dispute, was abrogated as to the issue of boundary dispute not being a proper matter for a declaratory judgment action. It remains good law as to other title disputes, however, and was recently cited by the Texas Supreme Court for that proposition. *MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 669 n.48 (Tex. 2009) (citing *Martin*, 133 S.W.3d at 267 (for position "that the Property Code describes trespass-to-try-title actions as '*the* method for determining title'")).

plaintiffs' suit was to obtain a determination of title to the leasehold and for further relief based on that determination.

Indeed, this Court recently re-emphasized the distinction between trespass to try title and a declaratory judgment action. *See Lile v. Smith*, 291 S.W.3d 75, 78 (Tex. App.—Texarkana 2009, no pet.). The appellant complained that the trial court was not authorized to enter a declaratory judgment action when title was at issue and the case was not a boundary dispute. *Id.* at 77–78. Noting that the proper vehicle was a trespass to try title and faced with a point of error that plainly recognized that and asked for relief on that basis, this Court sustained the appellant's point of error, reversed the trial court's judgment, and rendered judgment that appellees take nothing. *Id.* at 79.

Well-established authority supports the conclusion that this matter is not properly authorized to proceed as a declaratory judgment. *See Renwar Oil v. Lancaster*, 154 Tex. 311, 276 S.W.2d 774, 776 (1955) (in venue context; in order to determine a dispute concerning royalties, "the suit is essentially one for the recovery of land and to quiet title . . . even though cast as one for a declaratory judgment," an adjudication that certain unitization agreements were void was a conveyance in realty and, as to that matter, the suit was an effort to remove cloud from title, even though alleged as an effort to construe a contract).

Other cases examining the nature of the suit came in the context of venue. *Kilgore v. Black Stone Oil Co.*, 15 S.W.3d 666 (Tex. App.—Beaumont 2000, pet. denied); *Griffin v. Collins*, 310 S.W.2d 137 (Tex. Civ. App.—Amarillo 1958, no writ). In this line of cases, courts have

7

consistently characterized allegations concerning instruments relating to real property as suits concerning the title to land. *See also Kelly Oil Co. v. Svetlik*, 975 S.W.2d 762 (Tex. App.—Corpus Christi 1998, pet. denied) (dispute regarding overriding royalty interests necessarily hinged on determination of whether lease was in effect or terminated; since suit related to real property in Mississippi, Texas courts were without jurisdiction).

This Court has pointed out that "[a]ny suit that involves a dispute over the title to land is, in effect, an action in trespass to try title, whatever its form and regardless of whether legal or equitable relief is sought." *Jordan v. Exxon Corp*., 802 S.W.2d 880, 883 (Tex. App.—Texarkana 1991, no writ) (citations omitted).

Grizzle characterized and continues to characterize his suit as one for declaratory judgment. The Ramseys' countersuit likewise sought declaratory judgment (in addition to other causes of action). Optimal's petition in intervention also characterized its action against Grizzle and the Calhouns as a suit seeking declaratory judgment.

Since title to real property was at issue in the instant case, a declaratory judgment action is not a proper vehicle to resolve the matter. Had this been a boundary dispute, a declaratory judgment action is permissible. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.004(c) (Vernon 2008).[5] Had it been a case in which interpretation of the lease was at issue, the matter *may* have

---

[5]A declaratory judgment action may be brought "when the sole issue concerning title to real property is the determination of the proper boundary line between adjoining properties." TEX. CIV. PRAC. & REM. CODE ANN. § 37.004(c); *see State v. BP Am. Prod. Co.*, 290 S.W.3d 345, 360 (Tex. App.—Austin 2009, pet. filed); *Veterans Land Bd. v. Lesley*, 281 S.W.3d 602, 627 (Tex. App.—Eastland 2009, pet. filed).

8

been properly resolved through a declaratory action. *See Cadle Co. v. Ortiz*, 227 S.W.3d 831, 837–38 (Tex. App.—Corpus Christi 2007, pet. denied). As the instant case stands, however, title was at issue here, meaning the proper vehicle was a trespass to try title action.

Since this case involves title to real property, we will analyze it as a trespass to try title case regardless of the form or classification of the suit by the parties.

### 3. Requirements of trespass to try title action

An action in trespass to try title is the vehicle by which parties determine title to land, improvements on land, or other real property. TEX. PROP. CODE ANN. § 22.001(a); *see Rogers v. Ricane Enters., Inc.*, 884 S.W.2d 763, 768 (Tex. 1994); *Yoast v. Yoast*, 649 S.W.2d 289, 292 (Tex. 1983). Trespass to try title is a purely statutory creation and "embraces all character of litigation that affects the title to real estate." *Stanolind Oil & Gas Co. v. State*, 136 Tex. 5, 133 S.W.2d 767, 770 (1939). The action is governed by special pleading and proof requirements established by the Texas Rules of Civil Procedure. *See* TEX. R. CIV. P. 783–809. A plaintiff who has no interest at all in the land lacks standing to assert a trespass to try title action. *Walston v. Lockhart*, 62 S.W.3d 257, 259 (Tex. App.—Waco 2001, pet. denied).

To maintain an action of trespass to try title, the person bringing the suit must have title to the land sought to be recovered. *Brownlee v. Sexton*, 703 S.W.2d 797, 799-800 (Tex. App.—Dallas 1986, writ ref'd n.r.e.); *Wall v. Carrell*, 894 S.W.2d 788, 797 (Tex. App.—Tyler 1994, writ denied). A plaintiff's right to recover depends on the strength of his or her own title,

9

not the weaknesses of the title of his or her adversary. *Rogers*, 884 S.W.2d at 768; *Brownlee*, 703 S.W.2d at 799–800; *Land v. Turner*, 377 S.W.2d 181, 183 (Tex. 1964); *Wall*, 894 S.W.2d at 797. A defendant is not required to show title in himself or herself, nor may the plaintiff rely on the defendant's failure to do so. *Brownlee*, 703 S.W.2d at 799–800; *Wall*, 894 S.W.2d at 797. Ordinarily, a plaintiff may recover (1) by proving a regular chain of conveyances from the sovereign, (2) by proving a superior title out of a common source, (3) by proving title by limitations, or (4) by proving prior possession and that the possession has not been abandoned. *Rogers*, 884 S.W.2d at 768; *Turner*, 377 S.W.2d at 183.

### 4. Proof of title

Ramsey and Optimal argue that Grizzle has no standing to present what essentially is a trespass to try title suit because he did not prove any ownership of the property in question. It is true that Grizzle, having filed a declaratory judgment action, did not provide documentary evidence of his leasehold interest. The assignment from which Grizzle claims to have acquired the interest in 2003 is not in the record. He did testify to his acquisition of title. More importantly, Ramsey admitted in his pleadings and in testimony that Grizzle did have a valid lease at one time to the Hancock well.[6] In the Ramseys' original counterclaim, they allege ownership

---

[6]

        Q. . . . . You agree here today before the jury, Mr. Ramsey, that in 2003, 2004, Joe Grizzle had a lease with you. Correct?
        A. Yes
        Q. But you don't dispute that he had a lease. It's just your position that at some point it terminated. Right?

of a forty-acre tract in the John Price Survey A-673, Red River County, Texas, which is encumbered by the oil, gas, and mineral lease which forms the basis of this lawsuit. Further, it is alleged that before they acquired the property, George Hancock leased the property to Dale Glass, as lessee. Glass assigned the lease to counter-defendant (Grizzle).

### B. Standing (or Failure to Prove Title)

Ramsey and Optimal's first point complains of standing in terms of Grizzle's failure to prove chain of title. Ramsey cites authority relating to trespass to try title law on the principle that Grizzle "is not entitled to recover unless [his] own title is effectively disclosed." *Wall*, 894 S.W.2d at 796. Ramsey and Optimal point to the absence of evidence of legal title to the mineral estate and ask the Court to reverse on this issue "because Grizzle does not qualify for any affirmative relief." Grizzle and the Calhouns respond to the standing point of error by taking the position that the standing issue was waived; this is inaccurate since standing, an element of subject matter jurisdiction, cannot be waived. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444–45 (Tex. 1993). They go on to point out that all the parties recognized Grizzle as being the lessee and having title.

---

A. After ninety days.
. . . .
Q. . . . . There is no question that until you allege that the lease terminated, Mr. Grizzle had a rightful lease. Right?
A. Right.

11

Despite having been couched in terms of standing, it appears that the substance of the point of error goes to Grizzle's failure to prove he had good title, an element of a trespass to try title action.

It is evident that this case was tried by all parties as a declaratory judgment action which would not require proof of title in the orthodox manner required for trespass to try title cases. The issue before us is whether, despite this errant view, there is sufficient evidence in the record to support a conclusion that Grizzle owned a lease of the property in question. We find the evidence is sufficient based on the admissions of Ramsey that Grizzle had a "rightful" lease on the property as well as the pleadings acknowledging the lease. In essence, this was not a disputed issue as all parties assumed the lease was at one time valid and the entire trial was to determine if that valid lease had expired by its own terms. While Optimal never made such an admission, it took its title based on the ownership interest of Ramsey after Ramsey had concluded that the prior lease with Grizzle had expired. Optimal was not the lessor; Ramsey acknowledged Grizzle's leasehold interest. We find the evidence to be sufficient to allow Grizzle standing to assert his leaseholder rights in this action.

## C.    Factual Sufficiency of the Evidence

Ramsey and Optimal ask the Court to find that the evidence is factually insufficient to support the jury's verdict on the operations issue. To prove the lease had terminated, Ramsey and Optimal had the burden to prove that Grizzle failed to maintain operations on the Hancock well for

12

ninety consecutive days. *Phillips Petroleum Co. v. Rudd*, 226 S.W.2d 464, 466 (Tex. Civ. App.—Texarkana 1949, no writ); *Guleke v. Humble Oil & Ref. Co.*, 126 S.W.2d 38, 41 (Tex. Civ. App.—Amarillo 1939, no writ).

When considering a factual sufficiency challenge to a jury's verdict, the court must consider and weigh all of the evidence, not just that evidence which supports the verdict. *Ramsey v. Tex. Trading Co.*, 254 S.W.3d 620, 625 (Tex. App.—Texarkana 2008, pet. denied) (citing *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998)). Since Ramsey and Optimal had the burden on the continuous operations issue, they must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. We weigh all of the evidence, and can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *see Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

The 1999 lease under which Grizzle claims to still have an interest in the mineral estate contains the following language:

> Unless sooner terminated or longer kept in force under other provisions hereof, this lease shall remain in force for a term of [1 year] from the date hereof, hereinafter called "primary term", and as long thereafter as operations, as hereinafter defined, are conducted upon said land with no cessation for more than ninety (90) consecutive days.
>
> . . . .

13

> Whenever used in this lease the word "operations" shall mean operations for and any of the following: drilling, testing, completing, reworking, recompleting, deepening, plugging back or repairing of a well in search for or in an endeavor to obtain production of oil, gas, sulphur or other minerals, excavating a mine, production of oil, gas, sulphur or other mineral, whether or not in paying quantities.

The jury answered "No" to the following question:

> Do you find by a preponderance of the evidence that Joe Grizzle, while operator of the Hancock Well, failed to commence drilling or operations on the Hancock Well within ninety days after the well ceased to produce oil and gas?

The Court will look at the following evidence to determine whether factually sufficient evidence supports the jury's verdict.

When the primary term expired to maintain the lease, it was required that operations be conducted with no cessation for more than ninety consecutive days. Ramsey argues that during several time periods, each of more than ninety consecutive days, operations were not conducted. *See Samano v. Sun Oil Co.*, 621 S.W.2d 580 (Tex. 1981). We first must determine the time periods to be considered.

Initially the question is what periods of time are to be considered as the ninety days where no operations took place. In Ramsey's original counterclaim, which was not amended, it is alleged that on or about December 27, 2004, production ceased for a period in excess of ninety consecutive days. Optimal's pleading simply alleges that Grizzle's lease had expired "principally for lack of continuous operation." No special exceptions were made to the pleadings. Now at the appellate level, Ramsey and Optimal direct us to time periods during the years 2003 and 2006

14

showing the noncontinuous operations; no argument is presented that the lease expired due to inactivity in 2004.

Grizzle argues that neither the 2003 nor the 2006 time period of alleged noncontinuous operations should be considered as there was no pleading to support those time frames. Further, Grizzle argues that the 2006 period cannot be considered because, he alleges, prior to that time Ramsey had repudiated the lease thereby relieving Grizzle from continuing to comply with it. Countering that argument, Ramsey and Optimal point out that Grizzle did not plead the affirmative defense of repudiation and is precluded from relying on that defense. Repudiation is in the nature of an avoidance or affirmative defense which is not available to the defendant unless specifically pleaded. *Brantley v. Etter*, 662 S.W.2d 752, 757 (Tex. App.—San Antonio 1983), *writ ref'd n.r.e.*, 677 S.W.2d 503 (Tex. 1984) (citing *Mid-Tex Constr. Corp. v. Passero*, 430 S.W.2d 515, 517 (Tex. Civ. App.—El Paso 1968, writ ref'd n.r.e.)).

Grizzle filed a lawsuit against Ramsey, who responded with a counterclaim alleging the lease had terminated. Even after the matter was raised to the trial court, no trial amendment was offered on the repudiation issue. Grizzle did request a jury finding on the repudiation issue, which was denied by the trial court, but that denial has not been urged as erroneous by a counterpoint.

Ramsey pled that the production ceased on or about December 27, 2004, and that such cessation of production lasted for a period of time in excess of ninety consecutive days. The

pleading does not necessarily require a construction that the period of nonproduction was December 27, 2004 through March 27, 2004. Since the pleading was couched in terms of "in excess of" ninety days, the cessation period could, theoretically, have continued for years.

As to the 2003 time period, the pleading of Optimal alleged in the broadest of terms that the Grizzle lease had expired for lack of continuous operation without designating any time period whatsoever. Since no exception was made to this pleading, a limitation for a specific time period does not apply. Without limitation in the pleading and with no exception to the pleading, we cannot restrict the evidence on this issue to a particular time period. The fact that Optimal filed this unobjected-to global pleading placed all time periods in question without limitation. Consequently, the trial court did not err in submitting a jury issue without limiting a precise time period of the alleged noncontinuous operations. With this explanation, we will proceed to examine the operations at the well site during the time periods in 2003 and 2006 that are argued in the appellate briefs.

### 1. What are "operations"

The Texas Supreme Court has concluded that obtaining drilling permits and performing other preparatory work does not constitute "operations" when there is no actual work done on ground in an attempt to produce. *Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 160 (Tex. 2004). The Texas Supreme Court referred to operations that are necessary to maintain the lease

as " activities that were calculated to obtain production."  *Id.*[7]  Here, the question is not so much whether the activities were sufficient, but primarily a claim that the proof that any activities occurred at the well site is too incredible or weak to be believed.  For instance, Ramsey and Optimal acknowledge there are Texas Railroad Commission (RRC) records showing that seventy-three barrels of oil were produced in July 2003, but argue that evidence was a corrected report, belatedly filed, and that evidence that no electricity was used shows conclusively that no oil could have been produced.  As to the 2006 time period, appellants argue that Brooks' and Grizzle's testimony that Grizzle spent $30,000.00–$40,000.00 in the summer of 2006 to repair the rods was conclusively rebutted by other evidence.   So the question before the jury was primarily did Grizzle perform the activities he claimed or were these claims too insubstantial and weak that they could not, in law, be credited by the jury.

---

[7]In *Ridge*, the Texas Supreme Court summarized the facts of several cases to explain situations that qualify as "operations."  *Utley v. Marathon Oil Co.*, 31 S.W.3d 274, 275, 278–79 (Tex. App.—Waco 2000, no pet.) (lease required operations for drilling, mining, or reworking or additional operations to be commenced or prosecuted with no cessation of more than ninety consecutive days and pipeline leading to the well was being constructed during disputed time and "there were activities testing and trying to obtain production from . . . a 'wildcat' well"); *Petersen v. Robinson Oil & Gas Co.*, 356 S.W.2d 217, 219 (Tex. Civ. App.—Houston 1962, no writ) (court recounted activities each day, including driving a stake and leveling with a maintainer one day, more maintainer work the next two days, use of a Caterpillar the following day, constructing a road each of the next several days, and moving a drill onto the location, continuing work on the rig and drilling without interruption when lease required drilling or reworking operations with no cessation of more than sixty consecutive days); *Morrison v. Swaim*, 220 S.W.2d 493, 494–96 (Tex. Civ. App.—Eastland 1949, writ ref'd n.r.e.) (detailing work done each day after expiration of the primary term on well drilled before end of primary term under a lease that remained in effect after the primary term as long "as the lessee in good faith shall conduct drilling operations thereon and should production result").

### 2. Time frame :   May 1, 2003 to September 30, 2003

Grizzle points out that he did not own the well in May 2003.   RRC records show that no oil was produced in the months of May and June 2003.   Those records show seventy-three barrels for July 2003 but none for August and September 2003.   But pumper records (daily accounts of production) show zero each day for the month of July 2003; not 73.

Ramsey relies on records that no usage of electricity was shown during July, August, and September 2003, only a surcharge of $27.00.   Based on this evidence, Ramsey urges that it was impossible to produce oil during that time.   Other records, however, call into question the accuracy of the electrical usage reports.   For the month of February 2005, one set of electrical records shows a zero usage of electricity, while another Lamar Electric Co-op statement indicates 1335 kilowatt hours usage during that time period.   Evidence of operations consists of a belated and contradicted report of seventy-three barrels of production in July 2003; a pumper's record of emptying water from a tank on July 31, 2003; and a report of a sale that oil was purchased in July 2003.   Ramsey testified that he did not think the lease terminated in 2003.

Appellants also point out that the July 2003 production number is also contradicted by pumper Dale Glass' records showing that the well was down on June 30, 2003, that it was not repaired in July 2003, that there was no production in July 2003, and that there were no charges for pumping the well.   The August 2003 letter asking Eastex Crude (buyer) to suspend payment to Grizzle until the well was returned to a productive state also suggests that the July 2003 production

18

number filed four months late with the RRC is inaccurate or somehow askew. Glass testified that Grizzle regularly filed false or inaccurate reports with the RRC.

The draining of the water, the Ramseys and Optimal maintain, is insufficient to show operations, comparing it to the routine starting of a pump to keep it in running condition found as insufficient to show operations in *Hall v. McWilliams*, 404 S.W.2d 606 (Tex. Civ. App.—Austin 1966, writ ref'd n.r.e.). The Ramseys and Optimal point out that Grizzle hangs his hat on operations during this time period based on the production report.

The Ramseys and Optimal respond to the notion that Eastex's purchase of oil in July 2003 is factually insufficient to show operations at the well. They argue that the production record suggests that the oil purchased in July 2003 was produced earlier than July 2003. Further, they reiterate that the pumper's records and the electricity usage support the fact that the well was not producing in July 2003.

We find the jury could have reasonably found that there is some evidence of production during this time period and such finding would not be against the great weight and preponderance of the evidence.

### 3. Time frame: May 1, 2006 to November 30, 2006

The production reports filed with the RRC show that Grizzle did not produce any oil out of the Hancock well during this 210-day time period. Grizzle claimed "just normal operations" were

19

going on. On May 11, 2006, Grizzle sent a letter to the Ramseys seeking a ratification of the lease and offering money in exchange for the ratification.

Brooks also explained that Grizzle called for a workover rig to come out in April 2006, but that it did not get out to the well until October 2006, suggesting the well was down for those seven months. In somewhat inconsistent testimony, Brooks testified that sometime in the summer of 2006, Grizzle spent $30,000.00-plus replacing casings and rods.

The Ramseys and Optimal point to electrical records to suggest that Grizzle did not use any electricity at the well from February 28, 2006 to June 29, 2006. The testimony from Brooks concerning the work done at the Hancock well site during this time was:

> Q . . . . Isn't it true that during that summer, Mr. Grizzle replaced the rods and the pipe on the Hancock?
>
> A Yeah.
>
> Q So during this time he says y'all weren't doing anything, y'all replaced the casing and the rods.
>
> A Right.

Grizzle testified, "The well was down at some times in 2006, but we didn't abandon the well. We were out there working on it, but we didn't abandon it. That was -- if you remember back on the expense deal, that's when we spent the forty thousand dollars putting the pipe and the rods in, was during the summer of 2006."

While this evidence is nonspecific about precisely when the operations were conducted, it was the burden of Ramsey and Optimal to prove cessation of operations for ninety consecutive days. We must weigh all evidence introduced, and here Ramsey and Optimal had the burden to show the evidence was so weak or the finding was so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Francis*, 46 S.W.3d at 242.

Ramsey and Optimal proved that no oil was produced and presented evidence that no electricity was used through June 30, 2006. But the testimony of both Brooks and Grizzle, which was apparently credited by the jury, directly states that operations were done at the well in replacing the rods and pipes during the summer. Our decision rests on the placement of the burden of proof and the inferences the jury is allowed to make. Clearly, Ramsey and Optimal had the burden of proof; proving no oil production does not prove that no operations took place. Actual physical work being done on equipment in a good faith effort to place it in working order to produce oil constitutes sufficient operations to maintain the lease. For us to set aside this verdict as unsupported by the evidence, we must determine that the great weight of evidence is so contrary to the jury finding that the failure to find in Ramsey and Optimal's favor was manifestly unjust. Even though Brooks' and Grizzle's testimony might be inconsistent with other evidence (that the workover rig did not arrive until October), that was a matter of credibility for the jury to determine. We must recall that the jury found that Ramsey and Optimal failed in their proof; whether that would have been our finding on this evidence is irrelevant. If Grizzle did $30,000.00–$40,000.00

21

of work on the oil site in the summer in an effort to produce oil, presumably after June 30, 2006, it cannot be concluded that the jury finding is so against the great weight of the evidence as to result in a manifestly unjust result.

### D. Attorney's Fees

The final judgment awarded Grizzle $49,706.25 in attorney's fees. He is not entitled to them.

First, Ramsey and Optimal preserved this alleged error. *See Krabbe v. Anadarko Petroleum Corp.*, 46 S.W.3d 308, 320–21 (Tex. App.—Amarillo 2001, pet. denied) (concluding that since appellants failed to urge at trial court that appellee should not recover attorney's fees because suit was in essence a suit for title rather than being properly a declaratory judgment action and since appellant failed to assert such in court of appeals until after oral argument, error was waived). Here, in response to Grizzle's application for attorney's fees, the appellants objected in writing to his application maintaining that this was, by its nature, a trespass to try title action in which attorney's fees are unavailable. Ramsey also objected on the same basis to the inclusion of attorney's fees in their objection to the proposed final judgment.

The recovery of attorney's fees under a trespass to try title suit is barred because it is not provided for by the Texas Property Code.[8] *See Martin*, 133 S.W.3d at 264. Texas courts have followed this rule consistently. When a corporation's suit was in the nature of a trespass to try

---

[8]Attorney's fees are available in very limited cases involving trespass to try title: between a party claiming under record title and a party claiming by adverse possession when statutory prerequisites are satisfied. TEX. CIV. PRAC. & REM. CODE ANN. § 16.034(a) (Vernon Supp. 2009). This very narrow exception is not applicable here.

22

title, it was not entitled to recover attorney's fees. *McAnally v. Friends of WCC, Inc.*, 113 S.W.3d 875, 881 (Tex. App.—Dallas 2003, no pet.). An award of attorney's fees under the Declaratory Judgments Act was not appropriate in a suit that was in the nature of a trespass to try title. *Ely v. Briley*, 959 S.W.2d 723, 727 (Tex. App.—Austin 1998, no pet.). The defendant was correct in maintaining that the plaintiffs were not entitled to recover attorney's fees under Section 37.009 when the suit was in the nature of trespass to try title. *See Marshall*, 288 S.W.3d at 453–54; *see also EOG Res., Inc. v. Killam Oil Co.*, 239 S.W.3d 293, 304 (Tex. App.—San Antonio 2007, pet. denied).

We sustain this point of error and reverse the trial court's award of attorney's fees.

### E.      Improper Jury Argument

#### 1.      Jury argument at issue

Ramsey and Optimal now complain that Grizzle's attorneys made improper jury arguments; however, only one objection was made to the jury argument, and that concerned the issue of repudiation. We agree the trial court erred in failing to sustain that objection; since the issue of repudiation was not submitted to the jury, any discussion of the issue was irrelevant and therefore no argument should have been permitted. The question is whether the erroneous ruling probably caused the rendition of an improper judgment. TEX. R. APP. P. 44.1(a). The argument concerning the issue of repudiation made by one of appellants' attorneys was that Glass placed the chain on the property and Ramsey filed a lawsuit that the lease was terminated, but now after

Optimal intervened "they don't want repudiation." At that point, an objection was lodged and overruled. It was then argued that Glass testified that the chain was not to keep Grizzle out, but to keep beekeepers out—and this testimony was an effort to try "to make facts fit their theory." This argument appears to be an attempt to discredit the testimony of Glass in order to show "[o]ver-testifying." It is not an appeal to passion, or prejudice, but is irrelevant since the issue of repudiation was not presented to the jury. The mere possibility of harm is not sufficient. The entire record must support the conclusion that it is more probable that the jury's verdict reflects consideration of the improper matter than it is that the verdict was based on proper proceedings. *See Smith v. Smith*, 720 S.W.2d 586, 593 (Tex. App.—Houston [14th Dist.] 1986, no writ). We do not find this argument one that probably caused the rendition of an improper verdict and judgment.

No objection was made to any of the other complaints that Ramsey and Optimal now make about the jury arguments. The jury arguments complained of are in the following categories:

1. "I trust the testimony of these people down here in Red River County more so than I do a man that's sitting down in Houston";

2. Counsel's discussion that his father grew up nearby;

3. That elderly people can be taken advantage of by some businessmen;

4.   That as the various points were made by Ramsey and Optimal, Grizzle's attorney was able to answer each charge; Ramsey and Optimal had not met their burden of proof, and the testimony had "been to the point of trying to mislead."

### 2.   Analysis

Generally, a litigant will not be allowed to urge on appeal that a violation of the rules defining permissible jury argument resulted in an improper judgment unless the litigant made a timely objection to the argument.   TEX. R. APP. P. 33.1; *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839-41 (Tex. 1979).   In rare instances, however, there is an exception for argument so inflammatory that its harmfulness could not have been eliminated by an instruction to the jury to disregard it.   In instances of such "incurable" argument, the failure to object at trial is not a waiver of the right to complain on appeal.   *See Otis Elevator Co. v. Wood*, 436 S.W.2d 324, 333 (Tex. 1968).   However, unlike an appeal to racial or religious prejudice, an appeal to local prejudice or unity usually is considered a curable impropriety for which an objection is required.   *Rodriguez v. Hyundai Motor Co.*, 944 S.W.2d 757, 774 (Tex. App.—Corpus Christi 1997), *rev'd on other grounds*, 995 S.W.2d 661 (Tex. 1999).   Incurable jury argument is rare because typically retraction of the argument or instruction from the court can cure any probable harm.   *Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009) (citing *Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex. 2008)).   The party claiming incurable harm must persuade the court that, based on the record as a whole, the offensive argument was so extreme that a "juror of ordinary

intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument." *Id.* (quoting *Goforth v. Alvey*, 153 Tex. 449, 271 S.W.2d 404, 404 (1954)).

After examining the entire record, we find that none of the complained-of arguments meet the onerous test required. This point of error is overruled.

## III. CONCLUSION

We affirm the judgment of the trial court finding Ramsey and Optimal failed in their burden to prove a cessation of operations for ninety consecutive days and affirm the judgment finding Grizzle's lease valid. We reverse the judgment for attorney's fees and render judgment that Grizzle take nothing for attorney's fees.

Jack Carter
Justice

Date Submitted:  December 16, 2009
Date Decided:   May 19, 2010

26