

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-14-00032-CV

BP AMERICA PRODUCTION COMPANY, APPELLANT

V.

RED DEER RESOURCES, LLC, APPELLEE

On Appeal from the 31st District Court
Lipscomb County, Texas
Trial Court No. 12-08-4372, Honorable John B. Board, Presiding

May 18, 2015

OPINION

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

After a jury trial in a suit brought by appellee Red Deer Resources, LLC, the court signed a judgment terminating an oil, gas and mineral lease held by appellant BP America Production Company. BP appeals. We will affirm the judgment.

Factual and Procedural Background

Some 2113 acres in Lipscomb and Hemphill Counties, Texas, are subject to BP's Vera Murray lease. The lease, signed in 1962, began with a primary term of five years,

and continued "as long thereafter as oil, gas or other mineral is produced from said land." BP has owned and operated the lease since 2000.

Between 1967 and 1983, seven oil wells were drilled on the lease and produced from the Tonkawa formation. All were plugged by 2002. In 1986, the lessee drilled three wells completed in the Upper Morrow formation, the Vera Murray #9, #10 and #11. They began production as oil wells but in 1989 were reclassified as gas wells.

Of the three Upper Morrow wells, the #9 produced the greatest volume of gas, but its casing parted and it was plugged on April 27, 2009. By 2001, production from the #10 well had declined to about 100 Mcf per day. During that year, it experienced a sudden drop-off in production. BP treated the well for salt build-up and performed other work, but production never exceeded 20 Mcf per day after 2001. The #10 well was plugged in 2012. The parties stipulated at trial that the #10 well was not capable of producing in paying quantities on or after June 12, 2012, without additional equipment or repairs.

By 1994, production from the Vera Murray #11 was averaging about 200 Mcf per day. Production declined to something under 100 Mcf per day by 2000, and by 2009 had declined to less than 10 Mcf per day. An internal BP document,[1] prepared by its reservoir engineering department in 2012, forecast a 19.3% annual decline in production from the #11 during the period beginning January 1, 2012.

---

[1] The document was admitted as Red Deer's exhibit 41. It contains a graph depicting the well's gas production from about 1988 forward, and a projected decline curve for future production.

The #11 well is equipped with a "plunger lift" system, which allows gas production to be interrupted to permit the well to build reservoir pressure. When pressure builds to a preset level, the gas pushes the plunger up through the tubing, clearing liquids that hinder production and allowing a free flow of gas when the plunger reaches the wellhead. When the pressure declines as the gas is produced, the plunger falls back to the bottom of the tubing, and the cycle is repeated.

The evidence includes BP's monthly gas volume statements for the #11 well for the months of January 2009 through January 2013, admitted as Red Deer's exhibit 85. Each monthly statement has several columns, each column containing entries for each day of the month. One column depicts the number of hours the well flowed during each day; another depicts the volume of gas produced. Generally speaking, the statements show the #11 most often followed a pattern of producing gas every other day during the months before it was shut in. As examples of the entries seen on the statements, the January 2009 statement shows the well did not flow on January 1; flowed .70 hours on January 2, producing 10 Mcf of gas; flowed .47 hours on January 3, producing 10 Mcf, and did not flow on January 4. On six occasions during that month, the well flowed on two days in a row before a day of no flow; on six other occasions, the well flowed one day and did not flow on the next day. It produced on eighteen days, did not flow on thirteen. On one day, it produced 14 Mcf, the highest during that month. On the days the well produced that month, its production ranged from 10 to 14 Mcf.

The low production from the Vera Murray lease came to Red Deer's attention, and it obtained top leases from the mineral owners, signed from March through June

2011.[2]  In July 2011, Red Deer notified BP of its top leases and asserted its belief BP's wells were "non-commercial."  The parties exchanged correspondence over the next several months.

In May 2012, the #11 experienced a period of seven consecutive days with no flow of gas.  In the days that followed, the well resumed a general pattern of flowing gas for a period of time every other day.[3]  The well produced gas on June 4, 2012, but then began an eight-day period of no flow.  On June 12, BP shut the well in, and, on June 13, sent notice to the lessors that it was invoking the shut-in royalty clause of its lease, and enclosed checks for the shut-in royalty.[4]  The lessors did not negotiate the checks.  The #11 well has remained shut-in since.

_____

[2] The leases contain language expressing the parties' understanding that litigation might be necessary to establish that BP's 1962 lease had terminated, and language by which the lessors assigned the cause of action for lease termination, and other causes of action, to Red Deer.  Red Deer undertook to bear the expense of prosecution of the causes of action.

[3] According to BP's gas volume statements for May and June 2012, the #11 flowed .52 hours on May 24, producing 9 Mcf; flowed .56 hours on May 26, producing 11 Mcf; flowed .59 hours on May 28, producing 12 Mcf; flowed .62 hours on May 30, producing 12 Mcf; flowed .54 hours on May 31, producing 9 Mcf; flowed .57 hours on June 2, producing 10 Mcf; and flowed .59 hours on June 4, producing 10 Mcf.

[4] The shut-in royalty clause reads, in pertinent part:

Where gas from any well or wells capable of producing gas . . . is not sold or used during or after the primary term and this lease is not otherwise maintained in effect, lessee may pay or tender as shut-in royalty . . . an amount equal to the annual rental hereinafter provided, payable annually on or before the end of each twelve month period during which such gas is not sold or used and this lease is not otherwise maintained in force, and if such shut-in royalty is so paid or tendered and while lessee's right to pay or tender same is accruing, it shall be considered that gas is being produced in paying quantities, and this lease shall remain in force during each twelve-month period for which shut-in royalty is so paid or tendered . . . .

Red Deer brought suit against BP in Lipscomb County in August 2012. Its amended pleadings asked the court to declare whether BP's lease had terminated. The case was tried in July and August 2013. Red Deer asserted two theories. It first contended BP's lease had terminated because it had not produced in paying quantities, measured over a period of time ending on June 12, 2012. Secondly, it contended BP's invocation of the shut-in royalty clause was ineffective because the #11 well was not capable of producing in paying quantities when it was shut in on June 12.

The court's charge submitted these four questions to the jury:

Question 1: From April 27, 2009 to June 12, 2012, did the Vera Murray lease fail to produce oil or gas in paying quantities?

Question 2: Do you find that, under all the relevant circumstances, a reasonably prudent operator would not continue, for the purpose of making a profit and not merely for speculation, to operate the Vera Murray [l]ease in the manner in which the lease was operated between April 27, 2009 to June 12, 2012?

Question 3: Was the Vera Murray #11 well incapable of producing in paying quantities when it was shut-in on June 13, 2012?

Question 4: Do you find that, under all the relevant circumstances, if the Vera Murray #11 [w]ell were turned on, without additional equipment or repairs, a reasonably prudent operator would not, for the purpose of making a profit and not merely for speculation, operate the Vera Murray #11 well in the manner in which the well had been operated up to June 13, 2012?

To question 1, the jury answered, "No, the Vera Murray lease did not fail to produce in paying quantities." The jury did not answer question 2 because it was conditioned on an affirmative answer to question 1.

To question 3, the jury answered, "Yes, the Vera Murray #11 [w]ell was incapable of producing in paying quantities when it was shut-in on June 13, 2012." To question 4,

5

it answered, "Yes, a reasonably prudent operator would not continue to operate the well."

The court signed a judgment declaring the Vera Murray lease had "lapsed and terminated for the lease being incapable of producing in paying quantities when the Vera Murray Well #11 was shut in on June 13, 2012 and that a reasonably prudent operator would not continue to operate the well."

## Analysis

BP presents two broad appellate issues, the first asserting the judgment terminating its lease cannot be sustained by the jury's answer to question 3, and the second making the same assertion with regard to the jury's answer to question 4. Each issue contains subparts. Under issue one, BP argues question 3 is an immaterial question that cannot support the judgment, and argues the jury's answer is not supported by legally sufficient evidence. It also argues the court erred in a comment made in the presence of the jury, and committed error in the charge. BP similarly argues question 4 is an immaterial question, and further argues error in the charge.

Immateriality of Questions 3 and 4

Standard of review

Complaints of charge error are reviewed for an abuse of discretion. *Texas Dep't of Human Services v. E.B.,* 802 S.W.2d 647, 649 (Tex. 1990).[5] "A trial court abuses its discretion when it acts arbitrarily or unreasonably, without reference to guiding rules or

---

[5] *But cf. St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 525 (Tex. 2002) (plurality op.) (applying *de novo* standard of review when complaint was not of form of definition but that definition misstated the law).

principles." *Iliff v. Iliff,* 339 S.W.3d 74, 78 (Tex. 2011) (citing *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex. 1985)). A trial court has no discretion in determining what the law is or in applying the law to the facts. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding). Our review of a trial court's entry of judgment on a jury verdict is a question of law we review *de novo. Tex Star Motors, Inc. v. Regal Fin. Co., Ltd.,* 401 S.W.3d 190, 202 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (noting that determining the legal effect of the jury's answers is a question of law).

Application

A jury question is immaterial "when it should not have been submitted, it calls for a finding beyond the province of the jury, such as a question of law, or when it was properly submitted but has been rendered immaterial by other findings." 4 Roy W. McDonald & Elaine A. Grafton Carlson, TEXAS CIVIL PRACTICE § 25.12 (2d ed. 2001) (quoting *Southeastern Pipe Line Co. v. Tichacek,* 997 S.W.2d 166, 172 (Tex. 1999)). A jury question may also be immaterial "when its answer can be found elsewhere in the verdict or when its answer cannot alter the effect of the verdict." *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 752 (Tex. 1995).

BP argues question 3 should never have been submitted, and argues it was rendered immaterial by the jury's answer to question 1.

As noted, BP shut the #11 well in on June 12, 2012, and it has remained shut in since. The lease contains a sixty-day cessation-of-production clause, reading, "[I]f production from said land . . . should cease, and this lease is not otherwise maintained in force, . . . after the primary term, this lease shall not terminate if lessee commences

7

mining, drilling, or reworking operations on or before the expiration of sixty days from . . . cessation of production." It is undisputed BP did not commence such operations during the sixty days after June 12. The lease therefore terminated unless BP's invocation of the shut-in royalty clause was effective to maintain it.[6] *See, e.g., Hydrocarbon Mgt., Inc. v. Tracker Exploration, Inc.*, 861 S.W.2d 427, 431 (Tex. App.—Amarillo 1993, no writ) (lessors seeking lease termination had burden to establish lack of production and that lease was not otherwise maintained).

Payment of shut-in royalty is treated as a substitute for actual production and will maintain the lease if its terms are satisfied. *Tracker*, 861 S.W.2d at 432. But "[a] shut-in royalty will not preserve a lease if the shut-in gas well is not capable of production in paying quantities." 1 Ernest E. Smith & Jacqueline Lang Weaver, TEXAS LAW OF OIL AND GAS § 4.5[C][2], at 6 (LexisNexis Matthew Bender 2014) (citing, *inter alia*, *Kidd v. Hoggett*, 331 S.W.2d 515 (Tex. Civ. App.—San Antonio 1959, writ ref'd n.r.e.)); *Tracker*, 861 S.W.2d at 433; *see Anadarko Petr. Corp. v. Thompson*, 94 S.W.3d 550, 557-58 (Tex. 2002) (defining "capable of production").

BP's argument question 3 was made immaterial by the jury's answer to question 1 is premised on the contention the jury thereby found the Vera Murray lease produced in paying quantities during the period ending June 12, 2012. At a point in its briefing, for example, BP refers to "the jury's affirmative Question 1 finding that the well was profitable to the time it was shut-in." We do not agree the jury made such a finding. By its answer to question 1, the jury found the lease "did not fail" to produce oil and gas in

---

[6] The shut-in royalty clause was not invoked as to the #10 well, so its capacity to produce is not pertinent to question 3. And, as noted, the parties stipulated the #10 was not capable of producing in paying quantities when the #11 well was shut in.

paying quantities from April 27, 2009 to June 12, 2012. It was Red Deer's burden at trial to persuade the jury to give an affirmative answer to question 1.[7] *Tracker*, 861 S.W.2d at 431. That the jury was not persuaded to find in Red Deer's favor on the question was not a positive finding that the lease did produce in paying quantities during that period. *See Battaglia v. Alexander,* 177 S.W.3d 893, 903 (Tex. 2005) ("The jury's failure to find Battaglia negligent was not an affirmative finding that Battaglia was *not* negligent") (emphasis in original) (citing *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex. 1989); *C & R Transp., Inc. v. Campbell,* 406 S.W.2d 191, 194 (Tex. 1966)). "An answer unfavorable to the party having the burden of persuasion is not a finding of an unfavorable fact, but rather a failure to find an essential, favorable fact." 34 T. Ray Guy, THE JURY CHARGE IN TEXAS CIVIL LITIGATION: TEXAS PRACTICE SERIES § 6.1 at 105 (3d ed. 2003) (footnotes omitted).

Moreover, questions 1 and 3 inquired about different subjects; question 1 asked about the lease's production during a time both the #10 and the #11 wells were in production, while question 3 was limited to the #11 well.

Because a valid exercise of the shut-in royalty clause was necessary to preserve the lease when the #11 well was shut in for longer than sixty days, and because the shut-in royalty clause could not properly be invoked if the well were not capable of production in paying quantities at the time it was shut in, question 3 inquiring of that fact was properly submitted to the jury. And because the negative answer to question 1 was not a positive finding in BP's favor, the answer did not render question 3 immaterial.

---

[7] As noted, the affirmative answer stated in the charge was, "Yes, the Vera Murray lease failed to produce in paying quantities." The jury instead answered, "No, the Vera Murray lease did not fail to produce in paying quantities."

BP's contention question 4 is immaterial also is based on the argument the jury found the #11 well was producing in paying quantities through June 12, 2012. Because we conclude the jury made no such finding, we do not agree question 4 is immaterial.

Sufficiency of Evidence to Support Answer to Question 3

Standard of Review

When conducting a legal sufficiency review, we view the evidence in a light most favorable to the judgment and indulge every reasonable inference to support it, crediting favorable evidence if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 807, 822 (Tex. 2005). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex. 1996). More than a scintilla exists when the evidence would enable reasonable and fair-minded people to reach different conclusions. *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex. 2004). When evidence is so weak as to do no more than create "a mere surmise or suspicion" that a fact exists, the evidence does not exceed a scintilla. *Id.* "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller,* 168 S.W.3d at 827.

Application

BP's challenge to the evidence supporting the jury's conclusion the #11 well was not capable of producing in paying quantities on June 13, 2012 focuses on the testimony of Red Deer's expert witness John Walker, a petroleum engineer. BP

contends his opinions were no evidence because they were based on "unfounded assumptions and speculation" rather than the criteria set out by the Supreme Court of Texas. Red Deer responds that it is not necessary for us to evaluate Walker's opinion testimony because other evidence, mostly from BP's records, supports the jury's conclusion.

In *Tracker*, 861 S.W.2d at 434-35, we addressed the evidence necessary to support a conclusion a gas well is not capable of producing in paying quantities. Evidence there showed the Barnes well had several mechanical problems, including corroded tubing and casing, causing it to cease production when it was unable to flow against the sales line pressure. *Id.* Applying the standard that a well capable of production in paying quantities means a well that will produce in paying quantities if it is turned "on" and begins flowing, without additional equipment or repair, we found the evidence sufficient to establish the Barnes well was not capable of producing in such quantities when it was shut in. *Id.* at 435. The Supreme Court of Texas later adopted the *Tracker* definition, holding that "a well is capable of production if it is capable of producing in paying quantities without additional equipment or repairs." *Anadarko*, 94 S.W.3d at 558.

In *Anadarko*, the court discussed two of its opinions terminating leases that required only a capability of production to maintain them in effect. 94 S.W.3d at 561. In one case, the court noted, it held a lease terminated when the lessee abandoned all operations on the lease after the wells it had drilled ceased to produce, there was no production for about fourteen years and there was evidence the lessee had expressly released the lease. *Id.* (citing *Texas Co. v. Davis*, 113 Tex. 321, 254 S.W. 304, 305,

11

309 (1923)). In the second, when the lessee drilled a successful well but capped it, the court held there was no evidence the well could produce in paying quantities because there was no evidence of a market for the gas, facilities for its marketing or even evidence tending to show the well was near any prospective market justifying construction of a pipeline. 94 S.W.3d at 561 (citing *Hanks v. Magnolia Petr. Co.*, 24 S.W.2d 5, 6 (Tex. Comm'n App. 1930, judgm't adopted)). In addition, the court in *Anadarko* cited an Oklahoma case for the proposition that a well is incapable of production if its underlying mineral reserves are depleted. 94 S.W.3d at 558 (citing *Pack v. Santa Fe Minerals*, 869 P.2d 323, 327 (Okla. 1994)).[8]

The circumstances the court found sufficient to support lease terminations in *Davis*, 254 S.W. at 305, 309, and in *Hanks*, 24 S.W.2d at 6, are not present here. BP had not abandoned all operations on the lease, the #11 well's production and marketing facilities were in place and, through June 4, gas was being produced and sold. Nor do we have present here circumstances like those that led us to find the Barnes well incapable of producing in paying quantities in *Tracker*. 861 S.W.2d at 434-35. Nonetheless, we find legally sufficient evidence supports the jury's conclusion the #11 well was not capable of production in paying quantities at the time it was shut in.

Red Deer contends the evidence permitted the jury reasonably to find the #11 well "died" on June 4, and would not have begun flowing, without additional equipment or repairs, if it were "turned on" after being shut in on June 12. BP responds in part by

---

[8] *Cf. Clifton v. Koontz*, 160 Tex. 82, 325 S.W.2d 684, 691 (1959) (listing factors influencing reasonable and prudent operator in paying quantities determination to include "depletion of the reservoir").

pointing out it was not uncommon for the well not to flow for several days.[9]  But it was not necessary for the jury to go so far as to agree with Red Deer the well would not flow if turned on.  The well's capability to flow gas avails nothing for BP unless the flow of which it was then capable was in paying quantities.  *Anadarko*, 94 S.W.3d at 558.

BP's monthly volume statements in exhibit 85 depict the steady long-term decline in production from the #11 well.  As noted, by 2009 the well was averaging less than 10 Mcf per day.  From the statements it further appears the well produced an average of 213.4 Mcf per month during calendar year 2009, and an average of 200.17 Mcf a month during 2010.  The 2011 monthly average declined to 170.3 Mcf, and the average declined to 159.6 Mcf during the five months of 2012 the well produced.   And the jury had before it exhibit 41, BP's reservoir engineering department forecast, predicting a steeper decline in production.  As noted, that decline curve forecast production from the #11 well would decline at an annual rate of 19.3% beginning January 1, 2012.

Significantly, the document also contains entries regarding gas reserves underlying the well.  The entries state "Remaining Reserves 2658 [Mcf]" and "Total Reserves 1554477 [Mcf]," indicating estimated remaining reserves were less than one percent of the total reserves.[10]  It is unclear to us whether the exhibit reflects reserves

---

[9] BP correctly notes that there were frequent "zero flow" days as early as January 2009.  And the well experienced zero flow for as long as five days during March 2010. It is true also that there was an eight-day period of no flow during late April and early May 2012, and those eight days were followed by four days of consecutive production totaling 74 Mcf.  Later in May, as noted, the well went seven days with no flow, then resumed its general every-other-day production pattern through June 4, when it began eight days of no flow, before being shut in on June 12.

[10] BP engineer Rob Michelotti's testimony did not make specific reference to the reserve figures on exhibit 41, but he did testify concerning similar reserve figures on a corresponding exhibit, Red Deer's exhibit 35, showing BP's reservoir engineering

remaining as of January 1, 2012 or as of July 1, 2013, another date appearing on the exhibit, but in either event the estimate is a strong indication the well was near the end of its economic life. That conclusion is bolstered by the opinion testimony of BP engineer Rob Michelotti that it is "probably true" there was nothing BP economically could do to increase the well's production from the Morrow formation.[11] It is further bolstered by the testimony of Red Deer expert Walker, who characterized exhibit 41 as indicating the #11 well was "short-lived, if it's making a profit at all."[12]

At trial and on appeal, the parties have sharply disagreed over what BP expenses are properly included in the paying quantities calculation. But BP engineering expert Keith Masters conceded that, even using BP's expense figures, the #11 well did not produce in paying quantities over the five-month period it produced in 2012. BP strongly argues that non-paying production over a period so short as five months is no evidence the well could not produce in paying quantities when shut in. It contends no Texas court has found a period as short as five months adequate as a measure of production in paying quantities. In *Anadarko*, however, the court expressly noted there

---

department's decline curve forecast for the #10 well. He said the exhibit, while not conclusive, reflected "sort of a confirmation of the remaining potential that may exist in the reservoir."

[11] We recognize production in paying quantities would not require recovery of the cost of any reworking operations designed to increase production from the Morrow, and we would not want our reference to Michelotti's testimony to be taken as suggesting otherwise. *See Pshigoda v. Texaco, Inc.*, 703 S.W.2d 416, 418-19 (Tex. App.— Amarillo 1986, writ ref'd n.r.e.). Nonetheless, we consider his statement probative of the fact the #11 was nearing the end of its economic life, so far as Morrow formation production is concerned.

[12] As noted, BP contends parts of Walker's opinion testimony is not competent and thus constitutes no evidence. We do not understand its challenge to include the opinion here quoted, characterizing exhibit 41, the internal BP document.

is a difference between production in paying quantities and the determination of a well's capability to produce in paying quantities under a shut-in royalty clause. *Anadarko*, 94 S.W.3d at 558. Given the well's steady decline in production, the evidence of its projected steep decline beginning January 1, 2012, and the evidence of its relatively small remaining reserves, we think the jury reasonably could have considered its most recent months of production as most probative of the well's capability. And the combination of those elements of proof reasonably permitted the jury to conclude it was unlikely the well would return to profitable production.

BP also argues that, measured over the six-month period December 2011 through May 2012, rather than the five months of 2012, the #11 produced in paying quantities. Using BP's expense figures, during that six-month period the well produced a profit of $29.78. But the December production of 214 Mcf was substantially in excess of the average monthly production during calendar year 2011, and substantially in excess of the average during the 18-month period ending May 2012.[13] The jury was not required to see that month's production as a reversal of the general decline exhibited during the forty-one months depicted on exhibit 85, or to accept it as representative of the well's capability at the time it was shut in.

As a part of their arguments on evidentiary sufficiency, the parties spend a good deal of argument over the question whether June 12, 2012, or the next day June 13,

---

[13] As noted, according to the figures on Exhibit 85, the #11 well averaged 170.3 Mcf per month during 2011, and about 168.6 Mcf per month during the eighteen months ending May 2012. In addition, the December 2011 production of 214 Mcf was substantially in excess of the average monthly production during any 18-month period containing December 2011. The highest average monthly production for any such 18-month period was the July 2010 – December 2011 period, during which production averaged 180 Mcf per month.

should be regarded as the date the #11 was shut in. BP contends it is undisputed the well was shut in on June 12, when the valve to the sales line was closed. Red Deer insists the date of BP's shut-in royalty notice, dated June 13, controls. Much of BP's argument focused on June 12 is founded on its contention the jury's answer to question 1 was a finding the well was producing in paying quantities through June 12. The one-day difference in the ending date in question 1 and the date in question 3 leads BP to ask how a well producing in paying quantities on one day can lack that capability the next, absent some catastrophic event. Because we have rejected BP's characterization of the jury's answer to question 1, we reject also a contention there is significance to June 12 as the shut-in date as opposed to June 13. Under our view of the evidence, which of the two dates should be considered the shut-in date is not a material question. The parties agree that, under our opinion in *Tracker*, 861 S.W.2d at 432-33, Red Deer was required to prove the well lacked the capability of producing gas in paying quantities "at the time" it was shut in. With regard to the well's capability, the evidence is no different on June 12 than on June 13. The well did not flow on June 12 before the sales line valve was closed. More importantly, the well's performance at that time was consistent with its long-term production decline and with the forecast of BP's reservoir engineers for the future of its production beginning January 1, 2012.

BP also cites the language in *Anadarko* stating the well in that case "was capable of producing in paying quantities even though there were periods during which there was no production." 94 S.W.3d at 559. The well in *Anadarko* ceased to produce for two periods exceeding sixty days only because Anadarko's gas purchaser was repairing its pipeline. *Id.* at 553. There is no indication the well was otherwise incapable of

production in paying quantities. Unlike Anadarko's well, at the time BP's #11 was shut in, it had experienced a five-month period of unprofitable production.

We find the evidence, viewed in the light most favorable to the judgment, permitted reasonable and fair-minded people to reach the conclusion the #11 well lacked the capability to produce gas in paying quantities at the time it was shut in.

Charge Error in Question 3

BP next complains of three instances in which the trial court refused to include in the charge instructions BP requested. All relate to jury question 3.

Standard of Review

"The court shall submit such instructions and definitions as shall be proper to enable the jury to render a verdict." TEX. R. CIV. P. 277. "An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Union Pac. R.R. Co. v. Williams,* 85 S.W.3d 162, 166 (Tex. 2002) (citing TEX. R. CIV. P. 278). We review a trial court's decision concerning the submission of a requested definition or instruction for an abuse of discretion. *King Fisher Marine Serv., L.P. v. Tamez,* 443 S.W.3d 838, 842 (Tex. 2014); *El Paso Ref. v. Scurlock Permian Corp.,* 77 S.W.3d 374, 380 (Tex. App.—El Paso 2002, pet. denied) (op. on reh'g). When determining the propriety of instructions and definitions, trial courts enjoy wide latitude. *H.E. Butt Grocery Co. v. Bilotto,* 985 S.W.2d 22, 23 (Tex. 1998) (citing *Mobil Chem. Co. v. Bell,* 517 S.W.2d 245, 256 (Tex. 1974)).

Application

First, BP argues the court erred by refusing its requested instruction stating "there can be no arbitrary time limit" applied to a determination of production in paying quantities. It asserts such an instruction was necessary to "focus the jury on *Koontz*'s mandate that productive capacity cannot be determined from arbitrary snap-shots of isolated times without reference to long-term production history."[14] Red Deer responds by pointing out the court's instructions for question 3 included language stating, "You are instructed that to be capable of producing in paying quantities, if the well were turned on, production would be sufficient to yield a profit, even small, over operating and marketing costs *over a reasonable period of time* . . . ." (emphasis ours). Red Deer argues the court's instruction properly reconciled the necessity to determine the well's capability to produce in paying quantities for shut-in royalty purposes as of the time the well was shut in[15] with the requirements of case law that production in paying quantities must consider a reasonable period of time. *See Anadarko*, 94 S.W.3d at 559; *Koontz*, 325 S.W.2d at 690. We agree, and see no abuse of discretion in the court's refusal to add BP's requested language.

---

[14] *See Koontz*, 325 S.W.2d at 690 (holding "[t]here can be no arbitrary period for determining the question of whether or not a lease has terminated . . . .")

[15] As noted, it is undisputed that *Tracker*'s holding the well must be capable of producing gas in paying quantities "at the time it is shut-in," 861 S.W.2d at 433, applies under the language of the shut-in royalty clause in BP's Vera Murray lease. In all material respects, the language of the shut-in royalty clause is identical to the clause in *Tracker*. 861 S.W.2d at 433. Under different lease language, the determination may be made as of a different time. *See Chesapeake Exploration, Ltd. P'ship v. Corine, Inc.*, No. 10-06-00265-CV, 2007 Tex. App. LEXIS 6986 (Tex. App.—Waco August 29, 2007, no pet.) (distinguishing *Tracker* and holding lease language required capability to produce in paying quantities of well shut in during primary term to be determined as of end of primary term).

18

BP's second and third complaints relate to a paragraph in the instructions for question 3 that read as follows:

> You are further instructed that "operating and marketing costs" include expenses such as taxes, overhead charges, labor, repairs, and ordinary periodic expenditures which were allocated to this well and which were used on this well in order to produce or keep it producing. You shall not consider any costs or one-time investment expenses incurred in connection with the original drilling or any reworking of the wells on the lease.

BP argues the court erred by failing to give an additional instruction limiting "expenses offsetting the well's production to actual lifting and marketing expenses and taxes attributable to [the #11] well and not the lease as a whole." Red Deer points out the instruction defines operating and marketing costs as including expenses "allocated to this well and which were used on this well." We agree with Red Deer that no abuse of discretion is shown in the court's failure to give BP's requested additional instruction. *See Skelly Oil Co. v. Archer,* 163 Tex. 336, 356 S.W.2d 774, 782 (1962) (charge contained similar allocation language).

By its third complaint, BP argues the last sentence of the quoted paragraph improperly limited the phrase "any costs or one-time investment expenses," which the sentence told the jury not to consider, to those incurred in the original drilling or any reworking of the wells on the lease. It contends the court's failure to tell the jury not to consider any one-time investment or capital expenses incurred on the lease allowed the jury "to consider lease-wide infrastructure as well as capital expense attributed to the #11 well other than drilling and reworking expenses." The court's instruction was consistent with our opinion in *Pshigoda,* 703 S.W.2d at 418-19; *see Evans v. Gulf Oil Corp.,* 840 S.W.2d 500, 504 (Tex. App.—Corpus Christi 1992, writ denied) (following

19

*Pshigoda*). Read as a whole, the quoted paragraph properly limited operating and marketing costs to those allocated to the #11 well and BP's argument does not persuade us the court's instruction improperly permitted the inclusion of any capital expense attributed to the well.

Trial Court's Comment and Limitation on Cross-examination of Expert

In addition, BP argues the trial court erred in a comment made in front of the jury during its cross-examination of Red Deer expert John Walker, when the court referred to language in a Supreme Court of Texas opinion as "dicta." BP asserts the comment had the effect of binding the jury to an improper standard regarding expenses included in the "paying quantities" determination. We have quoted above the court's instruction on the expenses the jury should consider when determining the #11 well's capability to produce in paying quantities in question 3. *See Skelly Oil Co.,* 356 S.W.2d at 781; *Pshigoda,* 703 S.W.2d at 418 (instruction followed *Skelly*). We are not shown, nor can we see, how the trial court's "dicta" comment and ruling, even if error, "probably caused the rendition of an improper judgment." TEX. R. APP. P. 44.1(a)(1) (standard for reversible error).

In a related contention, BP also argues the court erred by improperly limiting its cross-examination of the Red Deer expert. BP did not make an offer of proof or bill of exceptions containing the substance of the excluded cross-examination testimony. Its complaint of a limit on cross-examination thus presents nothing for our review. TEX. R. APP. P. 33.1(a).

20

Charge Error on Question 4

Red Deer took its top leases on the Vera Murray acreage with the anticipation of drilling one or more horizontal wells into the Cleveland formation. There was evidence BP also considered development of the Cleveland or Tonkawa formations underlying the acreage to be desirable. BP had an agreement with another company, Mewbourne Oil Company, by which Mewbourne had the opportunity to propose drilling operations on BP-held leases. Mewbourne had expressed interest in the Vera Murray acreage as early as 2011 and had actually scheduled a drilling rig to drill two Cleveland formation horizontal wells in April and June 2012. But Mewbourne backed off the proposal after Red Deer took its top leases and asserted its belief BP's existing wells were not holding the lease. A January 2012 email from a Mewbourne landman to BP, referring to part of the Vera Murray acreage, reads:

> We like the section and would drill it but we would also like the issue with [Red Deer] worked out before hand. Has [Red Deer] responded to BP regarding [its] claim? If [Red Deer] would release [the] toplease and the title review went off without any problems I think we would drill it in fairly short order. Hope this helps.

A BP geologist testified at trial he was not aware of any factor other than Red Deer's top leases and "the threat of litigation" that prevented Mewbourne's proposed Cleveland wells from being drilled. BP expert Masters testified that the Cleveland formation underlying the Vera Murray lease is between 100 and 150 feet thick, and that the odds of failing to encounter hydrocarbons in such a well are "very, very low."

Aside from the potential Cleveland formation drilling, in July 2012 BP engineer Michelotti submitted to his superiors at BP a proposal to recomplete the #10 well by "sidetracking" from its wellbore and drilling horizontally into an area of the Tonkawa

formation that he considered underdeveloped. Michelotti testified that but "for the threat of a lawsuit" he would have recommended that BP "go forward" with the horizontal recompletion.

In connection with question 4, BP argues the trial court should have given specific instructions to the jury on the response the law expects of a reasonably prudent operator to the events confronting BP. Specifically, BP asserts the trial court reversibly erred by (1) failing to instruct the jury that BP could properly have shut in the #11 well because its title was challenged; (2) failing to define the term "speculation" as used in question 4 and its accompanying instructions; and (3) tailoring question 4 to the #11 well rather than to the entire lease.

Question 4, with its accompanying instruction, read:

Do you find that, under all the relevant circumstances, if the Vera Murray #11 [w]ell were turned on, without additional equipment or repairs, a reasonably prudent operator would not, for the purpose of making a profit and not merely for speculation, operate the Vera Murray #11 well in the manner in which the well had been operated up to June 13, 2012?

In answering this question, you must take into consideration all matters which would influence a reasonably prudent operator. Some of the factors are:

- the depletion of the reservoir and the price for which the lessee is able to sell his produce;
- the relative profitableness of other wells in the area;
- the operating and marketing costs of the well;
- the operator's net profit;
- the lease provisions;
- a reasonable period of time under the circumstances; and
- whether or not the lessee is holding the lease merely for speculative purposes.

22

The jury answered, "Yes, a reasonably prudent operator would not continue to operate the well."

BP first asserts error in the instructions for question 4 in the court's failure to list Red Deer's challenge to its leasehold among the relevant circumstances of which a reasonably prudent operator would take account. Specifically, it argues "Red Deer's challenge to BP's title is the critical circumstance" and "the jury should have been instructed that, under these circumstances, BP was entitled to shut-in the #11 well and to keep the well shut-in because of Red Deer's title challenge."

BP asserts that under the reasonably prudent operator standard "an operator has no duty to operate, and every reason to suspend operations, upon receiving notice its title is challenged." Red Deer responds that BP's assertion is merely an improper effort to inject the doctrine of repudiation into the case.

An oil and gas lessee whose title is wrongfully repudiated by "unqualified notice" that the lease is forfeited or terminated is excused from any obligation to conduct activities on the land necessary to hold the lease in force until the lease controversy is judicially resolved. *Ridge Oil Co. v. Guinn Investments, Inc.,* 148 S.W.3d 143, 157 (Tex. 2004); *Cheyenne Res., Inc. v. Criswell,* 714 S.W.2d 103, 105 (Tex. App.—Eastland 1986, no writ). The doctrine of repudiation is a variation of estoppel. *Chesapeake Exploration, L.L.C. v. Valence Operating Co.,* No. H-07-2565, 2008 U.S. Dist. LEXIS 70349, at *9 (S.D. Tex. Sept. 10, 2008) (citing *Exploracion De La Estrella Soloataria Incorporacion v. Birdwell,* 858 S.W.2d 549, 554 (Tex. App.—Eastland 1993, no writ)). Establishing repudiation of an oil and gas lease requires sufficient proof of a subsisting lease and the lessor's "unqualified notice" of lease forfeiture or termination. *Rippy*

23

*Interests, LLC v. Nash,* No. 10-12-00233-CV, 2014 Tex. App. LEXIS 9276, at *22-23 (Tex. App.—Waco Aug. 21, 2014, pet. filed) (citing *Valence Operating Co.,* 2008 U.S. Dist. LEXIS 70349). Repudiation also is described as "in the nature of an avoidance or affirmative defense which is not available to the defendant unless specifically pleaded." *Ramsey v. Grizzle*, 313 S.W.3d 498, 507 (Tex. App.—Texarkana 2009, no pet.).

BP does not contend it plead the doctrine of repudiation. Its argument does not use the word. But its reply brief refers to the evidence it shut in the #11 well "because of Red Deer's false challenge to BP's title" as "the heart" of the case. And it cites *Ridge Oil*, 148 S.W.3d at 157, and other cases referring to the repudiation doctrine. Outside the repudiation doctrine, BP cites no authority for its assertion it "was entitled to shut-in the #11 well and to keep the well shut-in because of Red Deer's title challenge." We see no abuse of discretion in the trial court's refusal to instruct the jury BP held such an entitlement. *See Union Pac. R.R. Co.,* 85 S.W.3d at 166.

The second error BP sees in the court's instructions on question 4 is its failure to define the word "speculation." BP tendered the following definition of speculation, which the trial court refused to submit:

> You are instructed that the term "speculation" used in this question and instruction does not refer to the inherently speculative nature of the oil and gas business. Instead, as used here operating "merely for speculation" means continuing to operate based on subjective hope that something might develop to make operations profitable, as opposed to a prudent operator's reasoned belief based on applying accepted industry standards to the relevant circumstances that the odds of the lease becoming profitable justifies continued operations.

As noted, rule 277 requires the trial court to "submit such instructions and definitions as shall be proper to enable the jury to render a verdict." TEX. R. CIV. P. 277.

24

"Proper instructions are those which aid the jury in answering the issues submitted; nothing else, however interesting or relevant to the case in general, is required." *Steinberger v. Archer County,* 621 S.W.2d 838, 841 (Tex. App.—Fort Worth 1981, no writ) (internal quotation marks omitted). The measure of a definition's propriety is its "reasonable clearness . . . to enable jurors to understand the word." *Gulf Ins. Co. v. Vela,* 361 S.W.2d 904, 906 (Tex. Civ. App.—Austin 1962, writ ref'd n.r.e.)

BP does not offer the source of its proposed definition or explain why a word of ordinary or common meaning should be regarded, for purposes of question 4, as a term of art necessitating a verbose definition. A trial court does not abuse its discretion by refusing to define a word having a clear and common meaning. *Nevauex v. Park Place Hosp.,* 656 S.W.2d 923, 925 (Tex. App.—Beaumont 1983, writ ref'd n.r.e.); *see Allen v. Allen,* 966 S.W.2d 658, 660-61 (Tex. App.—San Antonio 1998, pet. denied) (explaining "ordinarily the trial court is required to define or explain only those words or phrases given a distinctive meaning by law, and words having no special legal or technical meaning apart from their ordinary usage need not be defined"); *Taylor v. Lewis,* 553 S.W.2d 153, 159 (Tex. Civ. App.—Amarillo, 1977, writ ref'd n.r.e.) (stating rule 277 generally only requires the trial court define words or phrases given a distinctive meaning by law). The trial court did not abuse its discretion by refusing BP's proposed definition of speculation.

Finally, BP argues the trial court erroneously refused to focus question 4 "on a lease basis" rather than by reference to the #11 well, and further erred by refusing to submit an accompanying instruction that added to the list of factors influencing a

25

reasonably prudent operator the "actual plans to develop other productive formations in the near future."

Question 4 was conditionally submitted, to be answered by the jury only if it gave an affirmative answer to question 3. Question 3 asked about the lack of productive capability of the #11 well, the only well on the lease for which the shut-in royalty clause was invoked. As the court in *Kidd v. Hoggett* put it, "Shut-in royalty payments excuse production only if the well is actually capable of producing gas in paying quantities." 331 S.W.2d at 519. It is apparent that question 4 was intended to mirror the second step of *Koontz*'s two-step production in paying quantities test. *Koontz*, 325 S.W.2d at 691; *see Skelly*, 356 S.W.2d at 783 (per curiam) (op. on reh'g); *Pshigoda*, 703 S.W.2d at 418 (both describing two-step test).[16] Given that question 3 was limited to the #11 well, BP's argument does not convince that the trial court abused its discretion by declining BP's proposed inquiry in question 4 concerning the actions of a reasonably prudent operator with respect to the lease as a whole, or with respect to the potential of other formations. BP's reasoning based on the Cleveland formation potential is like that described by the court in *Kidd*, which said the defendants' reasoning there "reduce[d] itself to the contention . . . if they would now drill another [well], because of the known gas reserves, it would be a producing well." But, the court continued, "[t]hat is not such

---

[16] We have overruled BP's contention question 4 was an immaterial question. We have no need to address otherwise whether the submission of question 4 was required, and we express no opinion on that matter. It is clear from a reading of the record that its submission was considered necessary to comply with language in a passage in *Anadarko*, 94 S.W.3d at 559. There, the court wrote that it was not its intention to "overrule or otherwise call into question [its] prior decisions regarding the proper interpretation of 'production in paying quantities,'" and, in the next sentence, made reference to the requirements "for a well to produce in paying quantities *or to be capable of producing in paying quantities*." (emphasis ours).

proof of a producing well which will permit shut-in royalty in lieu of actual production." 331 S.W.2d at 519. (citations omitted). We think the same is true of BP's effort to broaden question 4 beyond the #11 well.

Moreover, the trial court made clear to the parties its list of relevant circumstances in the instruction was not intended as an exhaustive list or intended to limit the parties' arguments. BP made a strong argument to the jury that its plans for Tonkawa and Cleveland formation development demonstrated its intention to operate the lease for profit rather than speculation, and that its intention was that of a reasonably prudent operator.

Conclusion

We have rejected each of BP's arguments supporting its Issues One and Two. Accordingly, we overrule both issues, and affirm the trial court's judgment.

James T. Campbell
Justice

27